William Henderson (Partnership) v. Commissioner.
Henderson v. Commissioner
Docket No. 412 P.T.
United States Tax Court
1943 Tax Ct. Memo LEXIS 145; 2 T.C.M. (CCH) 684; T.C.M. (RIA) 46034; August 23, 1943
*145 Carl J. Batter, Esq., for the petitioner. Royal E. Maiden, Jr., Esq., for the respondent. SMITH Memorandum Opinion SMITH, Judge: This proceeding involves a claim for processing taxes paid under the Agricultural Adjustment Act on the processing of raw sugar in the amount of $1,138,421.82. [The Facts] Petitioner is a partnership engaged in the business of operating a sugar refinery at 749 South Peters Street, New Orleans, Louisiana. It processes raw sugar, by the "bone-char" process, producing granulated sugar, brown or soft sugar, powdered sugar, and small amounts of syrup and molasses. As a processor of raw sugar petitioner paid processing taxes under the Agricultural Adjustment Act for the period June 8, 1934, to October 31, 1935, in the total amount of $1,138,421.82. It timely filed a claim for refund of such taxes under the provisions of Title VII of the Revenue Act of 1936, which claim was disallowed by the Commissioner. A petition for review of the Commissioner's action in disallowing the claim was duly filed with the United States Processing Tax Board of Review and the case comes to us under the provisions of section 510 of the Revenue Act of 1942. Petitioner purchases *146 its raw sugar in the New Orleans and New York markets, where the same price levels usually prevail, in competition with other reimers. Usually the raw sugar is purchased several months in advance of processing and a thirty to sixty days' supply is kept on hand at the refinery to insure continuous operation. Some of petitioner's purchases, those from the Philippine Islands, require as much as sixty days for delivery. The refined sugar is sold under the trade name of "Henderson Crystal Sugar." All sales of sugar are made on a basis of 100 one-hundred pound bags and when sold in smaller packages an additional charge is added to the bulk price for the containers. The sale price varies from day to day and also varies in different localities. There is strong competition in the sugar trade among the refiners and petitioner often has to make price concessions to meet this competition. It does so in some instances by absorbing a part or all of the freight charges where sales are made outside of its established territory. The sale price of refined sugar and the cost price of raw sugar are not always correlated. Raw sugar prices fluctuate more frequently and to greater extremes than refined *147 sugar prices. Likewise the sale price of refined sugar does not always reflect the cost of production. Petitioner's output of one month may be sold at a profit and that of the succeeding month at a loss, depending on market fluctuations. Petitioner undertook to keep its regular customers supplied with sugar at prices which would enable them to sell to the retail trade with a reasonable margin of profit. A substantial portion of petitioner's sugar is sold in accordance with a trade practice known as "Contract bookings on Market moves." Under this practice the refiner advises its customers of intended advances in the sale price of sugar and permits them to book orders for at least a thirty-day supply at the price then in effect. Petitioner guarantees its customers, on purchases of 100 one-hundred pound bags each or more, against a decline in the price of sugar from the date of sale until the sugar is paid for. Payments are due in from seven to twenty-eight days, depending upon the quantity of sugar purchased. Payments on purchases of from 100 to 199 bags are due on the seventh day, on purchases of from 200 to 299 bags on the seventh and fourteenth days, on purchases of from 300 to *148 399 bags on the seventh, fourteenth, and twenty-first days, and on purchases of from 400 bags and over on the seventh, fourteenth, twenty-first, and twenty-eighth days. The guaranty against price decline is only on the unpaid-for portion. A cash discount of two percent is allowed if payments are made when due, or within a reasonable time thereafter. Petitioner's statutory tax period (for the purpose of the processing tax) began June 8, 1934, and ended October 31, 1935. The units of commodity processed, expressed in terms of pounds, 96 degree raw value, amounted to 235,557,801 pounds for the tax period, 303,057,455 pounds for the period two years before the tax, and 99,002,037 pounds for the period of six months after the tax period. Petitioner's statutory margin was $.00922898 for the tax period and $.00872695 for the base period. The statutory margin for the tax period therefore exceeded the margin for the base period by $.00050203. In the computation of the above margins no account was taken to the value of bags in which the raw sugar was contained when delivered to petitioner's refinery, nor of a loss on trading in raw sugar futures during the two years preceding the tax period. *149 Petitioner's total expenses, including the expenses of processing but not taking into account a loss of $42,813.68 resulting from trading in raw sugar futures, were $.00532516 per pound for the tax period and $.00492665 per pound for the base period. The gross sales value used in computing the above statutory margins was based on the current list price of the articles sold. Petitioner's actual realization on sales of granulated sugar, that is, the gross billings less freight, discounts, and allowances, averaged $.00408411 per pound less during the tax period and $.00323241 less during the base period than the gross sales value used in the computation of the margins. Similarly the current list prices used in computing the margins on sales of soft sugar exceeded the actual realization by $.00297598 in the tax period and $.00231658 in the base period. There was a rapid advance in the market price of sugar in the spring of 1936, due principally to the reduction of quotas by the Secretary of Agriculture and the resulting competitive buying. From the latter part of March to the latter part of April the net advances amounted to about $.75 per 100 pounds. During this period petitioner *150 had on hand a large inventory of raw sugar averaging about 24,017,800 pounds over and above all sales obligations. Following is shown the general price range of sugar per 100 pounds over the entire period June 1, 1932, to July 31, 1936: 1932
June 1-7
$3.75
July 1
3.90
Aug. 1
4.10
Sept. 1
4.25
Dec. 1
4.15
1933
Feb. 1
3.90
April 1
4.10
May 1
4.50
Aug. 1
4.70
Oct. 1
4.60
Dec. 1
4.50
1934
Jan. 1
4.30
March 1
4.50
May 1
4.30
June 1
4.10
June 8
4.65
June 25
4.75
Nov. 1
4.65
Dec. 1
4.50
1935
Jan. 1
4.30
March 1
4.50
March 27
4.70
March 31
4.90
May 1
5.25
Aug. 1
5.10
Oct. 1
5.30
1936
Feb. 1
4.65
March 11
4.75
March 25
4.85
March 31
5.00
July 31
4.75
During the tax period petitioner processed 210,804.763 pounds of raw sugar which had a cost of $.00117217 per pound less than the average current market value at the time of processing. During the base period (two years before and six months after the tax period) it processed 402,059,492 pounds of raw sugar which had a cost of $.00056569 per pound less than the average current market value at the time of processing. The advantage which petitioner thus gained was greater during the tax period by $.00060648 *151 per pound than during the base period. During the period June 28, 1934, to August 7, 1934, petitioner purchased 24,865,872 pounds of Cuban raw sugar on which the current duty rate was $1.50 per 100 pounds. The sugar on arrival in this country was placed in bonded warehouses and was not cleared through the United States Custom House until after September 4, 1934, when the duty had declined to $.90 per 100 pounds. Petitioner thus gained an advantage during the tax period from the reduction of the customs rate. Petitioner's imports of raw sugar from Cuba amounted to 14.65 percent of the total raw sugar processed for the two years preceding the tax period, 50.76 percent for the tax period, and 44.85 percent for the six months following the tax period. The duty paid during the tax period was $.009 per pound and before and after the tax period the average rate was $.01442879 per pound. A total of 44,592,764 pounds was imported during the two years before the tax period, 121,563,778 pounds during the tax period, and 45,762,598 pounds during the six months following the tax period. The quota system limiting the importation of raw sugar went into effect as a part of the Jones-Costigan Act *152 on June 8, 1934. It is stipulated that the inauguration of the quota system resulted in a direct increase in the price of raw sugar. At the time the processing tax went into effect the sale price of refined sugar was advanced throughout the sugar industry by approximately the amount of the tax. In a sales memorandum book kept by petitioner's sales manager, J. L. Many (now deceased), the following notation was made as of June 8, 1934: "6/8/34 - 11:23 A. M. Advance to $4.65 to cover sugar process tax." The processing tax rate was $.55 per Cwt. The June 7 sale price was $4.10. There was a further advance to $4.75 between June 25 and June 30, 1934. After the imposition of the processing tax petitioner billed som of its customers for the tax on sales of sugar, syrup and molasses as a separate item. There were 19 such transactions over the period June 8 to November 3, 1934, in which the processing taxes aggregated $1,639.19. Petitioner concedes that this amount of the taxes represented by its claim, in the total amount of $1,138,421.82, was passed on to its vendees and is not recoverable. A sales contract which petitioner executed with one of its customers in Chicago on July 22, 1935, *153 confirming the sale of 1,600 pounds of sugar at $4.90 f.o.b. New Orleans less "10 per Cwt. special allowance," carried the following typed-in provision: It is mutually understood that the basis price includes processing tax of 53.5 per Cwt. which is to be credited to buyers account if refunded to or withheld by seller due to tax being illegally assessed. [Opinion] Our question is what portion, if any, petitioner is entitled to recover of the processing taxes which it paid during the so-called tax period June 8, 1934, ending October 31, 1935. Petitioner has undertaken to show, in accordance with the requirements of section 902 of Title VII of the Revenue Act of 1936, that it bore the burden of the tax, except for a minor portion, and is therefore entitled to the refund claimed. Petitioner concedes, and it has been so stipulated, that the statutory margin comparison (section 907 (a)) is unfavorable to its claim, the margin for the tax period being at least $.00050203 in excess of the margin for the base period, and as a consequence has assumed the burden of proving, in accordance with section 907 (e), that the higher margin during the tax period was due to the existence of *154 "factors other than the tax". We have set forth above the basic facts from which these factors other than the tax are said to have arisen. The effect which the petitioner claims that each of the factors had upon the computation of the margins, expressed in terms of dollars and per pound, 96 degree raw value, is set out in its brief as follows: Total
Per Pound
Increased Expenses
$ 93,872.14
$.00039851
Failure to realize on Refined Sugar sales
171,148.08
.00072657
Failure to realize on Soft Sugar sales
8,049.74
.00003417
Profit on Unsold Unhedged Sugar
144,106.80
.00061177
Purchase of Raw Sugar
127,848.97
.00054275
Duty saving on sugar placed in bond
149,195.22
.00063337
Saving by duty reduction
470,664.73
.00199809
The Quota System
316,412.02
.00134325
Total of eight factors other than the tax affecting
margins
$1,481,297.70
$.0628848
Respondent contends that the factors relied upon by the petitioner did not affect the margins to the extent claimed by the petitioner and that in any event the evidence as a whole fails to show that petitioner bore the burden of any portion of the taxes which it seeks to recover. We think that the respondent must be sustained *155 in his denial of petitioner's claim. Granting that a portion or even all of the excess of the tax period margin over the base period margin was attributable to one or more factors other than the tax would serve the petitioner no more than to absolve it from the unfavorable statutory presumption or, at most, create a presumption in its favor, which the respondent would have the burden of rebutting. Excluding all consideration of the effect of the statutory presumption, the evidence of record, we think, would require us to rule that the petitioner did not bear the burden of all or any ascertainable portion of the processing taxes which it seeks to recover. It is established without contradiction that petitioner, along with the entire sugar industry, increased the sale price of its sugar by approximately the amount of the tax on the very day that the tax went into effect. The conclusion is inescapable that this increase was for the purpose of passing on the tax to the vendees. It does not appear, and petitioner makes no such claim, that the sale price was ever reduced at any time during the tax period by the amount of the tax or for the purpose of eliminating the tax from the sale *156 price. It is further shown that in a number of instances petitioner billed its vendees for the tax as a separate item. Petitioner concedes that the aggregate amount of tax on these sales was passed on to its vendees and is not recoverable. In view of this concrete and convincing evidence that in the beginning petitioner, along with other sugar refiners, adopted a policy of passing the tax on to its vendees by an increase in the sale price of sugar and in the absence of evidence that it ever changed that policy, either in practice or principle, we do not need to rely upon the statutory presumption in determining our ultimate question, whether as a matter of fact petitioner absorbed the tax or passed it on to its vendees. The facts in this case are quite similar to those in Caldwell Sugars, Inc., 2 T.C. 105, where we sustained the Commissioner in his denial of a refund claim for taxes paid on the processing of raw sugar by a Louisiana refinery. The discussion contained in our opinion in that case is pertinent here and refutes much of the argument made on behalf of the petitioner in this case. Decision will be entered for the respondent.